Exhibit A

| | |
|---|---|
| **DISTRICT COURT, COUNTY OF JEFFERSON, STATE OF COLORADO** <br><br> 100 Jefferson County Parkway <br> Golden, CO 80401 <br> 720-772-2500 | DATE FILED: May 11, 2016 5:23 PM <br> FILING ID: 6709928A1D822 <br> CASE NUMBER: 2016CV30751 |
| **Plaintiffs:**    **DANIEL SAUNDERS, M.D., and WESTSIDE WOMEN'S CARE, a Colorado General Partnership,** <br><br> v. <br><br> **Defendants:**    **PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, THE PAUL REVERE LIFE INSURANCE COMPANY, and UNUM GROUP.** | ▲ **COURT USE ONLY** ▲ <br> _____ <br><br> **Case Number:** <br><br> **Division:** |
| Bradley A. Levin, Atty. No. 13095 <br> Jeremy A. Sitcoff, Atty. No. 29393 <br> **LEVIN SITCOFF PC** <br> 1512 Larimer, Suite 650 <br> Denver, Colorado 80202 <br> (303) 575-9390 <br> Fax (303) 575-9385 <br> bal@levinsitcoff.com <br> jas@levinsitcoff.com | |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Daniel Saunders, M.D., and Westside Women's Care, a Colorado General Partnership, by and through their attorneys, LEVIN SITCOFF PC, for their Complaint and Jury Demand against Defendants, Provident Life and Accident Insurance Company, The Paul Revere Life Insurance Company, and UNUM Group, state and allege as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Daniel Saunders, M.D., is, and was at all times pertinent, a resident of Jefferson County, Colorado.

2.      Plaintiff Westside Women's Care, LLP, is a Colorado General Partnership doing business in the State of Colorado.

3.      Upon information and belief, Defendant Provident Life and Accident Insurance Company ("Provident Life") is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee.  Provident Life is authorized to do business in the State of Colorado.

4.      Upon information and belief, Defendant Paul Revere Life Insurance Company ("Paul Revere") is a Massachusetts corporation with its principal place of business in Worcester, Massachusetts.  Paul Revere is authorized to do business in the State of Colorado.

5.      Upon information and belief, Defendant Unum Group is a Delaware corporation and has its principal places of business in Chattanooga, Tennessee and Portland, Maine.  Upon information and belief, Unum Group is the parent company of Provident Life and Paul Revere and was the *de facto* decision maker with respect to coverage determinations that are at issue in this lawsuit.

6.      Defendants Provident Life, Paul Revere, and Unum Group are collectively referred to as "Unum Defendants."

7.      This Court has jurisdiction over the subject matter of this action.

8.      Under C.R.C.P. 98(c), venue is proper in this county, which Plaintiffs designate as the place of trial for this action.

## GENERAL ALLEGATIONS

9.      Dr. Saunders is a board-certified physician in Obstetrics and Gynecology ("OB/GYN").

10.     Dr. Saunders received his Colorado medical license in 1987.

11.     In 1994, Dr. Saunders, along with other physicians, formed WWC.

12.     Upon its formation, WWC was owned 50% by Crawford, Saunders, M.D., P.C., and 50% by Sweeney Minton, P.C.

13.     WWC offers comprehensive OB/GYN services to women of all ages.

14.     As an OB/GYN practicing at WWC, Dr. Saunders' duties included, but were not limited to, gynecological surgeries, both minor and major.  These surgeries were performed on both emergency and scheduled bases.  Dr. Saunders was also responsible for in-patient and out-patient care, pre-operative and post-operative care, and patients consultations.  In addition, Dr. Saunders treated patients with both normal and complicated high-risk pregnancies.  He also consulted with mid-wives and other primary care physicians.  Further, Dr. Saunders' duties included hospital and on-call responsibilities, which included emergency room consultations, labor and delivery coverage, surgery related to complications of pregnancy, and coverage for post-

2

operative patients for other physicians.  Finally, Dr. Saunders' office duties included, but were not limited to, benign gynecology, birth control, and health maintenance.

15.     In approximately 2007, Dr. Saunders was diagnosed with an idiopathic partial seizure disorder.

16.     Following this diagnosis, Dr. Saunders' neurologist, Dr. Katalin Pocsine, prescribed a low dose of Lamictal to control his seizures.

17.     After being diagnosed with the seizure disorder, Dr. Saunders was able to, and did in fact, continue to practice as an OB/GYN with WWC as the Lamictal was able to control his seizures.

18.     During the summer of 2014, Dr. Saunders began to experience increased seizure activity.

19.     After suffering a seizure on or about October 9, 2014, Dr. Saunders consulted with Dr. Pocsine who advised him to stop performing surgeries and deliveries effective immediately.

20.     Dr. Saunders continued to work as an OB/GYN at WWC, subject to Dr. Pocsine's limitations, until October 30, 2014, when Dr. Saunders suffered additional seizures.

21.     When this occurred, Dr. Pocsine recommended that Dr. Saunders stop working altogether as an OB/GYN.  Dr. Saunders complied with this recommendation.

22.     Dr. Pocsine told Dr. Saunders that he should not perform surgeries and deliveries until he was seizure-free for two years.

23.     Because Dr. Saunders had neither blacked out nor lost consciousness during any of his seizures in October 2014, Dr. Pocsine was not required to, and did not, restrict Dr. Saunders from driving.  However, Dr. Saunders voluntarily chose to restrict his driving, and, since his seizures in October 2014, has only driven on a limited basis.

24.     At the time Dr. Saunders stopped practicing as an OB/GYN at WWC, he was insured under a Disability Income Policy issued by Provident Life, Policy No. 4031964 (the "Disability Policy").

25.     Dr. Saunders' occupation at the time the Disability Policy was issued and at the time he became disabled as defined in the Disability Policy was as an OB/GYN.

26.     Dr. Saunders purchased the Disability Policy in 1990 and continuously paid the premiums for the Disability Policy.

27.     At the time Dr. Saunders stopped practicing as an OB/GYN at WWC, the Disability Policy entitled Dr. Saunders to $15,000 in monthly benefits with a cost of living adjustment for

the remainder of his lifetime as long as he was not able to perform the substantial and material duties of his occupation.

28.     On or about November 3, 2014, Dr. Saunders submitted a claim for benefits under the Disability Policy to Unum Defendants.

29.     On or about December 4, 2014, Disability Benefits Specialist ("DBS") Jackelyn Hoffses agreed that, based on the restrictions and limitations placed by Dr. Pocsine, it was reasonable for Dr. Saunders to be precluded from performing the duties of his occupation as an OB/GYN.  As such, DBS Hoffses recommended accepting liability on Dr. Saunders' claim under the Disability Policy.

30.     In response to DBS Hoffses' recommendation, Director Michael Speroni agreed that the restrictions and limitations were supported as of October 9, 2014.  However, Director Speroni indicated that Unum Defendants were awaiting receipt of Current Procedural Terminology ("CPT") codes and that, because the Disability Policy had a 90-day waiting period, which would be satisfied on January 9, 2015, the Unum Defendants would await the CPT code information prior to accepting liability for the claim under the Disability Policy.

31.     On or about December 10, 2014, DBS Hoffses requested CPT code information from Dr. Saunders.

32.     On or about December 26, 2014, Dr. Saunders provided Unum Defendants with CPT codes billed by him between January 1, 2014, and September 30, 2014.

33.     On December 31, 2014, Unum Defendants advised Dr. Saunders that they required additional time to make a decision on his claim for benefits under the Disability Policy.

34.     On or about January 6, 2015, DBS Hoffses requested an internal vocational review related to Dr. Saunders' claim for benefits under the Disability Policy.  Specifically, DBS Hoffses requested that Vocational Rehabilitation Consultant ("VRC") David Gaughan "review the CPT's and comment on [Dr. Saunders'] [occupational] demands."

35.     On or about January 13, 2015, VRC Gaughan completed his occupational review.  VRC Gaughan noted that Dr. Saunders' duties included hospital/call of approximately 24 hours per week.  He further noted that cognitive considerations for Dr. Saunders included the need for sustained attention and concentration, ability to read complex medical and technical materials, adherence to treatment protocols and standards, ability to plan and organize, make independent clinical judgments, supervise the work of others, and communicate clearly in speech and written language.

36.     VRC Gaughan did not have any additional vocational recommendations and returned the file to DBS Hoffses for handling.

37. On January 14, 2015, DBS Hoffses again recommended accepting liability for Dr. Saunders' claim under the Disability Policy, issuing benefits, and waiving premiums in accordance with the terms and conditions of the Disability Policy.

38. On January 15, 2015, Director Speroni agreed with DBS Hoffses that liability for Dr. Saunders' disability claim should be accepted. Director Speroni noted that benefits accrued as of January 7, 2015, and that the first payment was due at the end of January 2015.

39. By letter dated January 26, 2015, Unum Defendants advised Dr. Saunders that his claim for benefits under the Disability Policy was approved.

40. In January 2015, Dr. Saunders suffered two seizures on the same day. These seizures occurred following an extended period of sleep deprivation following Dr. Saunders' return from a mission to Cambodia.

41. On or about February 11, 2015, Dr. Saunders spoke with DBS Hoffses and advised her that prior to his disability he had overnight call where he was the primary on-call physician four times per month and was the back-up on-call physician approximately four times per month.

42. At the time Dr. Saunders stopped practicing as an OB/GYN at WWC, WWC was insured under a Business Overhead Expense Policy, Policy No. 01012664780, issued by Paul Revere ("BOE Policy"). WWC was also insured under a Buy-Sell Policy, Policy No. 0102664781, issued by Paul Revere ("Buy-Sell Policy"). Under the terms of these policies, Paul Revere is obligated to pay benefits to WWC in the event Dr. Saunders is unable to perform the important duties of his occupation as an OB/GYN.

43. On or about March 11, 2015, DBS Hoffses recommended accepting liability under the BOE Policy and issuing benefits for the period November 2014 to February 2015.

44. On or about March 11, 2015, Unum Defendants advised Dr. Saunders that WWC's claim for benefits under the BOE Policy was accepted for the period November 8, 2014 to February 1, 2015.

45. By letter dated March 13, 2015, DBS Amy Langlois advised Dr. Saunders that she was taking over the handling of his disability claim.

46. On or about May 11, 2015, Dr. Saunders advised Unum Defendants that WWC was pursuing benefits under the Buy-Sell Policy.

47. On or about May 13, 2015, DBS Langlois requested Dr. Saunders' assistance in getting a copy of a 2007 electroencephalogram ("EEG") test taken at Lutheran Medical Center ("LMC").

48. By letter dated June 11, 2015, Unum Defendants advised Dr. Saunders that they had received the 2007 EEG, which showed abnormal results.

49.    On June 11, 2015, DBS Langlois requested that Operations Physician ("OSP") Michael R. Theerman, M.D., review the file and comment on the 2007 EEG that had been received from LMC.  DBS Langlois asked Dr. Theerman whether the EEG supported restrictions and limitations for Dr. Saunders and, if so, what those restrictions and limitations were.

50.    Dr. Theerman is neither an OB/GYN nor a neurologist.  Rather, he is a physician licensed in the area of internal medicine.

51.    Dr. Theerman has performed medical reviews for Unum Defendants since at least 1999.

52.    Following his review, Dr. Theerman concluded that restrictions and limitations for Dr. Saunders were supported.  In the conclusion of his report, Dr. Theerman stated:

> Analysis/Rationale: while I have reviewed the records, summaries, and opinions others have prepared, I have performed my own independent analysis and formed my own conclusions, as follow.  While the insured's current seizures have been limited to an expressive aphasia, this could interfere with his ability to react as needed in an emergency situation in the operating or delivery rooms.  In addition, his seizures could generalize and become tonic-clonic in an unpredictable manner.  This would represent an unacceptable risk to his patients.  When he has become seizure free, he could return to full duties.

53.    In response to the referral question regarding whether there are supported restrictions and limitations and, if so, what they were, Dr. Theerman responded as follows:

> Yes.  The insured is prohibited from performing surgical procedures or delivering babies until he is seizure-free for a year.

54.    Dr. Theerman concluded his report stating, "[N]o further medical input at this time."

55.    In the summer of 2015, Dr. Saunders suffered additional seizures that were unrelated to sleep deprivation.

56.    By letter dated September 2, 2015, attorneys for WWC advised Unum Defendants that Dr. Saunders would not be bought out from WWC until he had been disabled for 12 months, corresponding to October 9, 2015.

57.    By letter dated November 4, 2015, Unum Defendants advised WWC that the claim for benefits under the BOE Policy reached its maximum benefit period as of October 9, 2015, and that no additional benefits would be paid.

58.     On or about November 28, 2015, Dr. Saunders provided Unum Defendants with an Individual Disability Status Update in which he advised Unum Defendants that he had not returned to work and that he was not able to perform any duties of his occupation.

59.     On or about December 1, 2015, Dr. Pocsine completed an Attending Physician Statement for Unum Defendants.  In the Statement she indicated that Dr. Saunders had made improvement in the frequency of seizures but is not seizure free yet.  She advised that Dr. Saunders had recurrent episodes of seizures, in the form of speech arrest.  With regard to treatment, she indicated that Dr. Saunders was now on an increased dose of Lamotrigine.  Finally, with regard to limitations, she indicated that Dr. Saunders could not do operations or invasive procedures.

60.     On or about December 16, 2015, WWC paid $197,415 to Dr. Saunders pursuant to the terms of the parties' buyout agreement.

61.     WWC's buyout of Dr. Saunders triggered Unum Defendants' obligation to pay benefits to WWC pursuant to the terms of the Buy-Sell Policy.

62.     By letter dated December 16, 2015, DBS Langlois provided Dr. Saunders with an update on his claim for benefits under the Disability Policy and WWC's claim for benefits under the Buy-Sell Policy.

63.     In that letter, DBS Langlois advised Dr. Saunders for the first time that "based on our assessment of the medical information received, the typical recovery time for your medical condition is that you should be seizure free for one year.  Once you remain seizure free for one year we will be assessing your full time return to work including surgical procedures and delivering babies."

64.     As of December 16, 2015, Dr. Saunders had not yet been seizure-free for one year. In fact, he had most recently had a seizure in the summer of 2015.

65.     Dr. Pocsine had advised Unum Defendants on the Attending Physician Statement that she provided on or about December 1, 2015, that Dr. Saunders was having recurrent episodes of seizure in the form of speech arrest.

66.     On December 21, 2015, Dr. Saunders spoke with DBS Langlois and advised her that the last time he had a seizure was during the summer of 2015.  Dr. Saunders further advised DBS Langlois that he was not driving and that Dr. Pocsine had increased his medication for his seizure disorder.

67.     On or about January 7, 2016, Dr. Saunders provided Unum Defendants with an Individual Disability Status Update identifying the medications prescribed to him by Dr. Pocsine.

68.     By January 2016, Unum Defendants were in possession of all information necessary to pay benefits under the Buy-Sell Policy to WWC.

69.     On or about January 18, 2016, Unum Defendants "converted" the issue of whether Dr. Saunders' restrictions and limitations precluded performance of his usual work activities as an OB/GYN physician into a "forum discussion."

70.     Unum Defendants held the "forum discussion" on or about January 21, 2016.

71.     Following the "forum discussion," Unum Defendants decided that Dr. Linda Cowell, a neurologist who had performed medical reviews for many years for Unum Defendants, and Dr. Theerman would do a joint peer call with Dr. Pocsine to discuss her restrictions and limitations for Dr. Saunders.

72.     Unum Defendants also decided that it would contact the local hospital to obtain documentation regarding the number of shifts per month and night call taken by Dr. Saunders between January and October 2014, despite the fact that Dr. Saunders had previously provided this information to Unum Defendants.

73.     On or about January 29, 2016, WWC advised Unum Defendants that between January and October 2014, Dr. Saunders had performed 41 on-call shifts.  35 of the on-call shifts were 24-hour shifts, meaning the shifts lasted from 5:00 p.m. to 5:00 p.m. the next day.  Six of the on-call shifts were 12-hour shifts, meaning the shifts lasted from 7:00 p.m. to 7:00 a.m. the next day.

74.     On or about January 28, 2016, Dr. Cowell spoke with Dr. Pocsine, who confirmed that Dr. Saunders' last seizure was approximately six months prior and that the seizure had not been provoked by sleep deprivation.

75.     During that same conversation, Dr. Pocsine advised Dr. Cowell that in regards to Dr. Saunders' occupational duties, there was clear evidence that sleep deprivation provokes his seizure disorder and therefore Dr. Pocsine considered Dr. Saunders to have a permanent restriction that he cannot perform any of his duties when sleep deprived and therefore could not do night shifts.

76.     Dr. Pocsine also informed Dr. Cowell that she had restricted Dr. Saunders from performing surgeries and using sharp instruments as she was unsure if during the periods of time that Dr. Saunders had noted his speech arrest there could also be accompanying periods of his being less attentive.

77.     On or about February 8, 2016, DBS Langlois requested a vocational review of Dr. Saunders' disability claim.  Even though Dr. Saunders had suffered a seizure only approximately six months prior, DBS Langlois focused on the night call aspect of Dr. Saunders' job.  Specifically, DBS Langlois requested VRC Gaughan – who had performed a vocational review in January 2015 – to review the CPT codes to determine if night call was a substantial and material duty of Dr. Saunders' occupation and whether there were job positions available to him that did not entail night call.

78.     On February 10, 2016, following his review, VRC Gaughan concluded that "call coverage was a component of insured's time/duties on a weekly basis prior to disability."  VRC Gaughan deferred commenting on whether positions were available to Dr. Saunders that did not entail night call pending completion of a "doctoral review" that had been requested on February 3, 2016.

79.     On or about February 16, 2016, Dr. Cowell completed her "doctoral review."

80.     Dr. Cowell agreed that Dr. Pocsine's restrictions and limitations for Dr. Saunders supported restriction of no night call.

81.     Dr. Cowell did not believe that Dr. Pocsine's restrictions and limitations for Dr. Saunders were supported for activities performed during regular working hours.

82.     Dr. Cowell did not agree with Dr. Pocsine that a two-year period of being seizure free before returning to work during the day was supported.  Dr. Cowell did not say what period of being seizure free was supported nor did she comment on Dr. Theerman's opinion that Dr. Saunders should be seizure free for one year before performing surgical procedures or delivering babies.

83.     Dr. Cowell stated that "sleep deprivation likely provokes the reported seizure activity and therefore should be avoided."  On that basis "it would be reasonable to limit the insured's duties to shifts that do not interfere with his required eight hours of regular sleep per night that would restrict him from performing night shifts."

84.     On February 16, 2016, DBS Langlois referred Dr. Saunders' disability claim to Dr. Alan Neuren, a physician practicing in the areas of psychiatry and neurology, for a "Designated Medical Officer Opinion."

85.     Dr. Neuren was a Vice President-Medical Director for Unum between 2001 and 2005.

86.     Dr. Neuren has provided medical consulting services to Unum Defendants and other Unum-affiliated companies since 2001.

87.     On February 17, 2016, Dr. Neuren completed his medical review.

88.     Dr. Neuren agreed that Dr. Saunder's 2007 EEG was abnormal.

89.     Dr. Neuren agreed with Dr. Pocsine that Dr. Saunders should not do night call.

90.     Dr. Neuren was of the opinion that there was a lack of support for restricting Dr. Saunders from working during the day, even though his medical review documented Dr. Saunder's ongoing seizures since October 2014, including six seizures in the summer of 2015.

91.     Dr. Neuren was of the opinion that a two-year period of being seizure free, as recommended by Dr. Pocsine, was excessive.

92.     Dr. Neuren was not asked, and did not state, what period of remaining seizure-free was supported.

93.     Dr. Neuren was not asked about Dr. Theerman's opinion that Dr. Saunders should remain seizure free for one year before performing surgical procedures or delivering babies.

94.     Ultimately, Dr. Neuren concurred with Dr. Cowell's assessment.

95.     On or about February 17, 2016, Director Jessica Berryman requested VRC Gaughan perform an occupational analysis on Dr. Saunders.

96.     On or about February 23, 2016, VRC Gaughan completed his occupational analysis.

97.     VRC Gaughan never spoke with Dr. Saunders or anyone else affiliated with WWC in conjunction with his occupational analysis.

98.     VRC Gaughan never spoke to or consulted with an OB/GYN in conjunction with his occupational analysis.

99.     In his occupational analysis, VRC Gaughan stated that Dr. Saunders' inability to take part in night call would not preclude him from performing the full scope of unrestricted OB/GYN duties 40 hours per week which, according to VRC Gaughan was in line with the average hours worked per week prior to Dr. Saunders' disability.

100.     VRC Gaughan determined that, given Dr. Saunders' tenure and experience as an OB/GYN, "he would have the flexibility to be selective in the nature/type of employment settings he joins" and therefore he would not be required to do night call.

101.     After VRC Gaughan concluded his occupational analysis, Director Berryman asked VRC Gaughan to clarify his statement that call coverage was a component of Dr. Saunders' time and duties on a weekly basis.  Specifically, Director Berryman inquired as to whether night call was a material and substantial duty of Dr. Saunders' occupation as a OB/GYN.

102.     On or about February 25, 2016, VRC Gaughan responded that, when considering Dr. Saunders' time and duties in totality, his earnings from night call in 2013 and 2014 minimally contributed to his overall income and therefore night call was not a material and substantial duty of Dr. Saunders' occupation.

103.     On or about February 24, 2016, Director Berryman referred Dr. Saunders' file to Director Jaimie Allard for a review of an adverse decision on Dr. Saunders' claim under the Disability Policy.

104.    Although Unum Defendants had previously accepted liability on Dr. Saunders' claim for benefits under the Disability Policy, had been paying him benefits since January 2015, and had indicated that he would be entitled to ongoing benefits until he had been seizure-free for one year, Director Allard approved the denial of further disability benefits to Dr. Saunders.

105.    By letter dated February 26, 2016, Unum Defendants advised Dr. Saunders that Unum Defendants would not continue paying him benefits under the Disability Policy.

106.    Based on the determination that the supported restriction of no night call would not preclude Dr. Saunders from performing the material and substantial duties of his occupation as an OB/GYN, Unum Defendants also concluded that benefits under the Buy-Sell Policy were not payable.

107.    By letter dated February 29, 2016, Unum Defendants advised WWC that it would not approve payments under the Buy-Sell Policy because Dr. Saunders did not meet the policy definition of Total Disability at the time the "buy sell" occurred.  As such, Unum Defendants stated that the claim for benefits under the Buy-Sell Policy, including the waiver of premium benefit, were closed and terminated, effective February 29, 2016.

108.    By letter dated February 29, 2016, Unum Defendants informed Dr. Saunders that benefits would not be paid to WWC under the Buy-Sell Policy.

109.    On February 29, 2016, Unum Defendants closed Dr. Saunders' claim for benefits under the Disability Policy and WWC's claim for benefits under the Buy-Sell Policy.

110.    All conditions precedent to coverage under the Disability Policy and the Buy-Sell Policy have been satisfied.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract – All Defendants)

111.    Plaintiffs incorporate by reference each and every allegation of this Complaint and Jury Demand as if fully set forth herein.

112.    The Disability Policy and the Buy-Sell Policy constitute contracts of insurance.

113.    As described above, Unum Defendants breached the Disability Policy by refusing to continue paying Dr. Saunders disability benefits under the terms of the Disability Policy.

114.    As described above, Unum Defendants breached the Buy-Sell Policy by refusing to pay WWC the benefits due and owing under the Buy-Sell Policy.

115.    As a result of Unum Defendants' breach of the insurance contracts, Dr. Saunders and WWC have suffered damages in amounts to be proved at trial.

11

**SECOND CLAIM FOR RELIEF**
**(Bad Faith Breach of Insurance Contract – All Defendants)**

116.    Plaintiffs incorporate by reference each and every allegation of this Complaint and Jury Demand as if fully set forth herein.

117.    In addition to the express duties imposed upon them by the contracts of insurance, Unum Defendants owed duties to Plaintiffs under the Disability Policy's and Buy-Sell Policy's implied covenant of good faith and fair dealing, wherein Unum Defendants covenanted that they would deal with Plaintiffs fairly and honestly, faithfully perform their duties, give Plaintiffs' rights the same consideration as Unum Defendants accord their own, and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' rights to receive the benefits of the Disability Policy and the Buy-Sell Policy.

118.    Unum Defendants breached their duties of good faith and fair dealing by their actions which include, without limitation, the following conduct:

a)    Their denial of benefits to Dr. Saunders and WWC without a reasonable basis in fact or law;

b)    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the Disability Policy and the Buy-Sell Policy;

c)    Failing to conduct a reasonable and unbiased investigation into Dr. Saunder's and WWC's claims for benefits under the Disability Policy and the Buy-Sell Policy;

d)    Ignoring pertinent information establishing that Unum Defendants had an obligation to pay policy benefits to Dr. Saunders and WWC;

e)    Depriving Dr. Saunders and WWC of the benefits and protections of the contracts of insurance;

f)    Placing their interests above those of their insureds; and

g)    Other conduct to be revealed in discovery.

119.    As a result of Unum Defendants' bad faith breach of the insurance contracts, Dr. Saunders and WWC have suffered damages in amounts to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**(Violation of C.R.S. § 10-3-1115-1116 – All Defendants)**

120.    Plaintiffs incorporate by reference each and every allegation of this Complaint and Jury Demand as if fully set forth herein.

121.     Sections 10-3-1115(1) & (2), C.R.S. 2015, forbid a person engaged in the business of insurance from unreasonably denying or delaying payment of a claim for benefits owed to or on behalf of a first-party claimant.

122.     Plaintiffs are first-party claimants under § 10-3-1115(1)(a)(I).

123.     Unum Defendants are persons engaged in the business of insurance.

124.     Unum Defendants have delayed and denied full payment of the benefits of the Disability Policy and the Buy-Sell Policy without a reasonable basis within the meaning of § 10-3-1115(2).

125.     Section 10-3-1116(1), C.R.S. 2015 provides that a first-party claimant whose claim for payment of benefits has been unreasonably denied or delayed may bring an action to recover reasonable attorneys' fees and court costs, and two times the amount of the covered benefit.

126.     The actions of the Unum Defendants, as described above, violated § 10-3-1115(2).

127.     Accordingly, Plaintiffs bring this claim to recover statutory damages measured by reasonable attorneys' fees and court costs incurred in prosecuting this claim and two times the covered benefit to include interest as permitted under § 10-3-1116(1).

**WHEREFORE**, Plaintiffs, Daniel Saunders M.D., and Westside Women's Care, LLP, respectfully request that judgment be entered in their favor and against Defendants, Provident Life and Accident Insurance Company, The Paul Revere Life Insurance Company, and Unum Group, as follows:

a.     For compensatory economic and non-economic damages as may be proven at trial;

b.     For two times the covered benefit, as permitted by C.R.S. § 10-3-1116(1);

c.     For reasonable attorneys' fees, costs, and expenses incurred herein;

d.     For all pre- and post-judgment interest, statutory and moratory, as permitted by law; and

e.     For such other and further relief as the law permits as this Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 11th day of May 2016.

Respectfully submitted,

**LEVIN SITCOFF PC**


_s/ Bradley A. Levin_
Bradley A. Levin
Jeremy A. Sitcoff
*Attorneys for Plaintiffs*

Plaintiffs' Addresses:
Daniel Saunders, M.D.
15343 W. Bayaud Ct.
Golden, CO 80401

Westside Women's Care
7950 Kipling Street
Arvada, CO 80001